Filed 1/19/21  In re W.B. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re W.B.,<br><br>a Person Coming Under the Juvenile Court Law.<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>K.C.,<br><br>      Defendant and Appellant. | B305013<br>(Los Angeles County<br> Super. Ct. No. 19CCJP08197A) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Nancy R. Brucker, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

Appellant K.C. (mother) is the mother of W.B. (born Jan. 2016).[1] She contends there is insufficient evidence to support the juvenile court's jurisdictional findings and dispositional orders as they pertain to her. We disagree and conclude that: (1) substantial evidence supports the jurisdictional findings; (2) substantial evidence supports the dispositional orders requiring mother to participate in group counseling for victims of domestic violence and joint counseling with father in the event the parents plan to reconcile; and (3) mother has forfeited the right to object on appeal to the order requiring her to undergo individual counseling. Accordingly, we affirm.

## BACKGROUND

*Background and Detention*

### *August 2016 Incident*

W.B. was the subject of a child welfare referral dated August 23, 2016, alleging the child was the victim of emotional abuse and general neglect due to domestic violence between the parents. Respondent Los Angeles County Department of Children and Family Services (DCFS) investigated the referral.

DCFS reports and call logs reflected the police responded to calls of domestic violence involving parents in August 2016 and August 2019. Officers who responded to the incident in 2016 interviewed W.B.'s maternal grandmother (MGM) who said that she, mother and W.B. had

---

[1] W.B.'s father (father) is not a party to this appeal.

2

gone to the home to collect mother's belongings, and mother (who was separated from father at the time) found father and a woman (Jessi) together. Mother confronted Jessi, took photos of her with father and followed Jessi out of the home. MGM stayed inside with W.B. but heard a dispute outside. When the parents came inside, father demanded mother's phone, but she refused to give it to him. Father threw mother to the floor and grabbed her to get the phone. MGM put W.B. down and tried to help mother, but father shook her off and made her fall. When father released mother, MGM saw blood coming from mother's hand. Mother corroborated MGM's account. She acknowledged striking Jessi and said the glass screen on her phone broke and cut her hand during the struggle with father. Mother called 911 to report the incident, and told the responding officers there had been three previous (unreported) incidents of domestic violence between the parents. After the August 16 incident, mother obtained a TRO against father.

When interviewed, father agreed with the initial portion of MGM's and mother's account. However, he claimed that mother and MGM assaulted him when he came back from escorting Jessi outside. He said mother hit him on the face several times and he tried to take her phone away to defend himself. They struggled and the screen shattered and cut mother's hand.

Police officers observed that mother had a two-inch laceration on one hand. Father had multiple scratches on his neck and chest and a laceration on one finger, and he complained of pain on the side of his

face.  Mother was treated by paramedics and father was arrested for spousal abuse and treated at the jail dispensary.

DCFS's investigation substantiated an allegation of general neglect with respect to father and deemed it inconclusive with respect to mother.  DCFS deemed the allegation of emotional abuse by father inconclusive.  The August 2016 referral was closed as "situation stabilized" after mother terminated her relationship with father, relocated to MGM's home and obtained a TRO and custody orders.  The parents reconciled and began living together again after the one-year TRO expired.

*August 2019 Incident*

In mid-September 2019, DCFS received another referral after police responded to a call on August 15, 2019 regarding domestic violence between parents.  DCFS's report says mother claimed father returned from work while she was on the phone in bed, with W.B. asleep on her arm.  Father went into the living room, but later returned to the bedroom and told mother to move over.  She refused and father punched her three times on her buttocks, climbed atop her and tried to strangle her with both hands.  The report states, "[mother] then grabbed her son to wake him up, hoping that [father] would not hurt her if their son was a witness or called for help."  Father took mother's phone to keep her from calling the police, and mother went to Helen's room for help.  Helen (who owned the home) interceded, and father returned mother's phone and left.  The police report reflects that mother

sustained abrasions on her neck and complained of sore buttocks. Paramedics treated mother's injuries.

In early October 2019, a DCFS social worker met with mother who reiterated her account that father had come home intoxicated and wanted her to make room for him in the bed. When she twice refused father became angry and pushed her and tried to strangle her. Three-year-old W.B. was asleep in the room (or in the bed with mother) at the time. Mother woke the child and took him to Helen's room. Mother called the police after Helen de-escalated the situation and father left. Mother said father had moved out and would not be permitted to return. Mother claimed she and father had been involved in just one prior incident of domestic violence when W.B. was eight months old.

The CSW spoke again with mother on November 23 and on December 5, 2019. Mother said that Father did not live with mother but came over regularly to take W.B. to the park, and that he sometimes picked the child him up at school and took him on weekends. Mother did not have a TRO or family law order against father and did not fear him. The parents had no plans to live together in the near future, and mother agreed to cooperate with DCFS.

The CSW interviewed father on November 23, 2019. He denied that mother had been holding W.B. during the incident in August 2019, and urged DCFS to close the investigation. At father's request, father was re-interviewed in December with his counsel. Father explained that mother was angry when he came home late on the night of the incident and suspected he was being unfaithful to her. He claimed

mother was the aggressor during the incident and he merely held her down as she tried to hit him. He denied hitting or trying to strangle her. Father acknowledged that W.B. was in the room during the incident but said the child was unharmed. Father denied that he drank excessively or used drugs. He said that, although the parties' prior custody order had expired, he and mother had arranged for him to pick up W.B. several times a week and he and W.B. spoke daily. Father had no concerns about mother's caretaking of W.B. and said she was a great partner.

A DCFS risk assessment concluded W.B. was at "high" risk of future neglect. This conclusion was premised on (1) the parents' conflicting accounts of the most recent incident of domestic violence, (2) the fact that mother had filed two police reports complaining she sustained injuries as a result of father's violence, (3) father's arrest for domestic violence, and (4) the fact that W.B. was present during both incidents of domestic violence. DCFS also referred to mother's claim that father appeared to be intoxicated during the most recent incident, and that mother obtained a TRO after the 2016 incident.

On December 24, 2019, DCFS filed a non-detained petition pursuant to Welfare and Institutions Code section 300.[2] The petition alleged that three-year-old W.B. was at risk due to the parents' violent altercations in his presence, mother's violent altercation with Jessi in the child's presence and her failure to protect W.B.

---

[2]    Statutory references are to the Welfare and Institutions Code.

At the detention hearing on December 26, 2019, the court found DCFS had established a prima facie case that W.B. was a person described under section 300. W.B. was permitted to remain in parents' custody, and DCFS was ordered to provide maintenance services.

*Jurisdiction/Disposition Report*

A DCFS Dependency Investigator (DI) interviewed four-year-old W.B. at mother's home on January 30, 2020. The child was playful during the interview but paid little attention to the DI. He said his parents did not fight.

An investigation of father's criminal history revealed a 2011 conviction for battery and a 2016 arrest for inflicting corporal injury on a spouse/cohabitant. DCFS opined that the parents had minimized the level of violence between them and failed to acknowledge their history of discord. Although the parents currently were separated, DCFS believed they were likely to reconcile and that they needed to address their relationship issues. With regard to W.B.'s safety, DCFS reported that mother had shown she was protective of the child and had not allowed father to reside in their home. W.B. was receiving play therapy to address trauma he experienced as a result of parents' violence.

Mother submitted two progress reports to the juvenile court. One report indicated mother had attended seven sessions of individual counseling, during which she had discussed anger management and relationship issues with her therapist and was making considerable progress. The second report showed W.B. had attended four play

therapy sessions in which he had been consistently engaged and attentive and was making considerable progress.

A combined jurisdiction/disposition hearing took place February 18, 2020. The juvenile court found that parents' violent conduct placed W.B. at risk. The court was troubled by the parents' unresolved history of violence toward one another, and the fact that mother had used W.B. as leverage during the most recent episode of violence with father. The court observed that, although the family had some "moments of calm[,]" W.B. was very young and had "clearly [been] in a zone of danger" during the violent incidents in 2016 and 2019. The petition was sustained.

Proceeding to disposition, DCFS noted that, although the proposed case plan did not include a requirement that parents participate in joint counseling if they chose to reconcile, such a requirement was in order. Both parents opposed such an order. In addition, mother requested that she be permitted to address issues of domestic violence and its effect on children in her ongoing individual counseling sessions, and not be required to participate in a domestic violence support group. In response, the court observed that DCFS had tailored the case plan specifically for mother and stated that the juvenile court itself "might have viewed [the case] differently in terms of who had the scratches and who was the victim." DCFS noted that mother appeared to have been a co-combatant in 2016, but that father had been the primary aggressor in the August 2019 incident. Counsel for both DCFS and W.B. agreed mother could best address issues regarding being a victim of domestic violence in a support group. The juvenile court agreed such a

8

requirement was "appropriate . . . because mom kind of opened the door."

Mother's counsel initially informed the court that she did not know if mother would agree to a case plan that required joint counseling for parents. After father informed the court that he had no plans to reconcile with mother, the court observed that the matter was "solved" because the requirement for joint counseling was contingent on parents' intent to reconcile. The court further observed that, in light of parents' history of violent interactions, the order requiring joint counseling if they were to reconcile would obviate the need for a new order. The court stated it was adding the requirement for contingent joint therapy for the parents and asked if both parents had signed the case plan. Mother's counsel responded affirmatively and confirmed that the matter was "submitted." W.B. was declared a juvenile court dependent and placed in home-of-parents. Mother appeals.

## DISCUSSION

Mother maintains there is insufficient evidence to support the juvenile court's jurisdictional findings or the dispositional order as they pertain to her.

### I. *The Standard of Review*

We review a juvenile court's jurisdictional findings and disposition orders for substantial evidence. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384 (*Kadence P.*).) Evidentiary conflicts are

resolved in favor of the respondent and, where possible, legitimate inferences are indulged to uphold the court's decision. We do not reweigh or express an independent judgment on the evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) The appellant bears the burden to show the evidence was insufficient to support the findings and orders. (*Ibid.*)

II. *Applicable Statutes*

    a. *Section 300, subdivision (a)*

Under section 300, subdivision (a), a juvenile court may exert dependency jurisdiction if a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent . . . . For purposes of this subdivision, a court may find there is a substantial risk of serious future injury . . . [if circumstances] indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) Exposing a child to violence or placing the child in harm's way may trigger jurisdiction under this provision if there is evidence the violence will likely continue. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598–599 (*Giovanni F.*).) Subdivision (a) does not require that a parent's violence be directed at the child (*In re M.M.* (2015) 240 Cal.App.4th 703, 719– 720), because "[d]omestic violence [itself] is nonaccidental." (*Giovanni F.*, at p. 600.)

Because this provision governs circumstances where there is a "substantial risk" of harm, there is no need to show that the child

previously suffered harm by virtue of the violence. (*Kadence P., supra,* 241 Cal.App.4th at p. 1383 ["the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child"]; *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 [same].) Even if the child does not suffer physical harm, exposure to domestic violence may cause significant suffering. (*Ibid.*) The underlying rationale for this rule is that ""domestic violence in the same household where [a child is] living . . . is a failure to protect [the child] from the substantial risk of encountering the violence and suffering serious physical harm . . . ."" [Citation.]" (*In re R.C.* (2012) 210 Cal.App.4th 930, 941 (*R.C.*); *Giovanni F., supra,* 184 Cal.App.4th at pp. 600–601 [domestic violence may be a basis for jurisdiction under § 300, subd. (a)].)

b. *Section 300, subdivision (b)*

Under section 300, subdivision (b), a juvenile court may assume jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Again, a juvenile court is not required to "'wait until a child is seriously . . . injured to assume jurisdiction and take the steps necessary to protect the child.'" (*I.J., supra,* 56 Cal.4th at p. 773.) "'The purpose of dependency proceedings is to prevent risk, not ignore it.'" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) Section 300

11

requires only a "'substantial risk' that the child will be abused or neglected." (*I.J.,* at p. 773.) Exposure to domestic violence may serve as the basis for a jurisdictional finding under section 300, subdivision (b)(1), because a child may be put at substantial risk of harm. (See, e.g., *In re T.V.* (2013) 217 Cal.App.4th 126, 134 (*T.V.*); *R.C., supra,* 210 Cal.App.4th at p. 941.)

III.  *Substantial Evidence Supports the Juvenile Court's Assertion of Jurisdiction*

The sustained petition alleges, under both section 300, subdivisions (a) and (b), that W.B.'s parents have a history of engaging in violent altercations in their young child's presence (based on the incidents of domestic violence in 2016 and 2019), and that mother failed to protect W.B. by allowing father to live in the home with unlimited access to the child. The parents' violence against one another, coupled with mother's failure to protect W.B., endangers the child's physical health and safety and puts him at risk of serious physical harm.

Mother challenges the jurisdictional findings only as they pertain to her conduct, not father's. "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory

12

grounds for jurisdiction are supported by the evidence.' [Citation.]" (*I.J., supra*, 56 Cal.4th at p. 773.)

Mother acknowledges that we need not consider her challenge to the assertion of jurisdiction over W.B. Nevertheless, she asks that we consider her challenge to the court's findings because they may have significant consequences for her later during the pendency of this case or may affect her interests in possible future family court proceedings with respect to W.B. Although W.B. will remain under juvenile court jurisdiction whether or not the findings as to mother are reversed, we will exercise our discretion to reach the merits of her challenge to the jurisdictional findings. Those findings form the predicate for the challenged dispositional orders, and the findings may have future implications for mother in this or future proceedings beyond jurisdiction. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763.)

Mother maintains there is insufficient evidence to support the jurisdictional findings as to her, based on the parents' physical altercations in 2016 and 2019. We disagree.

First, there was evidence that both mother and father were aggressors during the incident in 2016 as each suffered injuries. Also, at that time, mother told police there had been three previous unreported incidents of domestic violence between the parents.

Second, whoever was the initial aggressor, the record reflects the domestic violence in 2016 occurred after mother photographed father and Jessi against their wishes, continued when mother followed Jessi

13

outside the house and assaulted her, and began anew when father returned after escorting Jessi out.

Third, regarding the incident in 2019, although the evidence points strongly to father initiating the attack, the juvenile court believed mother contributed to the violence. The court also was troubled that mother had used W.B. as "leverage" to protect herself (by waking the child and holding him in the hope it would cause father to stop hitting her), conduct the court viewed as unprotective of the child.

Although W.B. was not physically harmed by the parents' nonaccidental violence toward one another, those altercations occurred in his presence or so close that the child could easily have been physically harmed by his parents, particularly in 2019 when he was in the bed while mother and father fought. That W.B. was not physically injured is fortunate but does not defeat juvenile court jurisdiction. (See *In re M.M., supra,* 240 Cal.App.4th at p. 706 [court found that child was endangered when parents engaged in physical violence while one parent held the child].)

Fourth, that the parents were not living together at the time of the jurisdictional hearing did not negate the risk to W.B. The parents had reconciled after the 2016 incident of domestic violence and were living together again when the 2019 incident occurred. Also, mother made statements to DCFS suggesting the parents might reconcile again.

Finally, that DCFS, and ultimately the juvenile court, permitted W.B. to remain in his parents' care does not negate the bases for

14

assertion of jurisdiction. Rather, it reflects only that DCFS and court believed the issues that brought W.B. to the court's attention could be addressed while he remained in his parents' care, so long as they participated in services designed to ameliorate the problems under DCFS' supervision.

IV.  *Substantial Evidence Supports Those Disposition Orders as to Which Mother Has Not Forfeited Her Objections*

Mother contends there is insufficient evidence to support the juvenile court's disposition orders requiring her to participate in individual counseling, a domestic violence support group for victims, and joint counseling with father, in the event they choose to reconcile.

Mother did not object during the juvenile court proceeding to the court's requirement that she participate in individual counseling. She has forfeited the right to challenge that order on appeal. (*In re Richard K.* (1994) 25 Cal.App.4th 580, 589 [parent's submittal on DCFS's recommended case plan "dispels any challenge to and, in essence, endorses the court's issuance of the recommended findings and orders"]; *T.V., supra,* 217 Cal.App.4th at p. 136 ["[W]hen a parent submits on a [DCFS's] recommendation . . . she forfeit[s] the right to contest the juvenile court's decision if it coincides with that recommendation"].)

Regarding the order that she participate in group counseling, we reject mother's contention that, because she took appropriate action after the incidents of domestic violence by father and did not act like a "victim," she does not need to participate in group domestic violence

15

counseling for victims. As discussed above, the parents' domestic violence was reoccurring, took place in W.B.'s presence and, on at least one occasion, mother was the primary victim.

As to the requirement that the parents engage in joint counseling if they intend to reconcile, the court did not abuse its discretion in considering this contingency given the parents' history of reconciliation and domestic violence. Further, if, as mother now contends, the parents do not reconcile, the requirement of joint counseling will not be triggered.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:


MANELLA, P. J.


CURREY, J.


16